# UNITED STATES DISTRICT COURT
for the
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
**Jul 15, 2019**
SUE BEITIA, CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
WHITE APPLE IPHONE, CURRENTLY LOCATED AT )   Case No. Mag. No. 19-00682 KSC
595 ALA MOANA BLVD, HONOLULU, HI 96813 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
WHITE APPLE IPHONE, CURRENTLY LOCATED AT 595 ALA MOANA BLVD, HONOLULU, HI 96813

located in the _____ District of _____Hawaii_____, there is now concealed *(identify the person or describe the property to be seized)*:
Refer to Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| Title 21 U.S.C. Section 841 | Possession with intent to Distribute Methamphetamine |

The application is based on the facts on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested.
☐ Sealing of all documents in connection with the above-captioned matter except the search warrant and return is requested, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Amy Garon, HSI
*Printed name and title*

Sworn to under oath before me telephonically and attestation acknowledged pursuant to FRCP 4.1(b)(2).

Date: ____07/15/2019____ at 11:54 a.m.



City and state: Honolulu, Hawaii

Kenneth J. Mansfield
United States Magistrate Judge

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

CHRIS A. THOMAS #3514
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 440-9200
Facsimile: (808) 541-2958
E-mail: Chris.thomas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: A WHITE APPLE IPHONE, CURRENTLY LOCATED AT 595 ALA MOANA BLVD, HONOLULU, HI 96813 | Mag. No. 19-00682 KSC |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Amy Garon, a Special Agent of Homeland Security Investigations (HSI), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

    2.    I am a Special Agent with the Immigration & Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been since April of 2007. I am currently assigned to the HSI Office of the Special Agent in Charge, Honolulu, Hawaii, and investigate all laws related to Customs and Immigration. I was also a Reserve Special Agent with the Coast Guard Investigative Service (CGIS) from November 2003 to January 2015. As a CGIS SA, I was assigned to the CGIS Resident Agent Office Honolulu and investigated violations of federal criminal law and the Uniform Code of Military Justice. Prior to HSI, I was a Honolulu Police Officer from July 1997 to April 2007 and responsible for the enforcement of municipal and state traffic and criminal laws. I have participated in all aspects of narcotics investigations including surveillance, execution of search warrants, and arrests of numerous narcotics traffickers.

    3.    During my tenure with HSI, I have become knowledgeable with the enforcement of State and Federal laws pertaining to narcotics and illegal drugs. Based on this experience, I have become well versed in the methodology utilized in narcotics trafficking operations, the specific types of language used by narcotic trafficking operations, and the unique trafficking patterns employed by narcotic organizations. I am aware that it is generally a common practice for drug traffickers to use their cellular telephones to communicate with drug customers and drug suppliers. It is also a common practice for drug traffickers to maintain cellular telephones close at hand in order to facilitate their drug trafficking business. Such equipment permits traffickers to remain in close and nearly instantaneous communication with their customers and suppliers. Cellular telephones also typically have electronic memory capability within which frequently-called telephone numbers can be stored and "speed-dialed". I am aware that it is a common

practice for drug traffickers to use their cellular telephones to store their drug associates' telephone numbers within their contact list. Additionally, cellular telephones are capable of storing the telephone numbers of incoming calls and keeping incoming voice mail messages, incoming and outgoing text messages and other pages. Moreover, in a number of prior drug trafficking investigations, the electronic memories of cellular telephones have been found to contain the contact telephone numbers of and/or messages from other persons identifiable as being involved in the drug trafficking activity under investigation.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a white Apple iPhone, hereinafter the "DEVICE." The DEVICE is currently located at 595 Ala Moana Blvd., Honolulu, HI 96813.

6. The applied-for warrant would authorize the forensic examination of the DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. In November 2015, a Homeland Security Investigations Undercover Special Agent, herein after HSI UCA, was introduced to Ramon OLAZABAL VALENZUELA.

8. On November 19, 2015, the HSI UCA purchased approximately one pound of crystal methamphetamine directly from OLAZABAL VALENZULA for $4,200.00. The transaction took place in Pleasant Hill, CA. The HSI UCA and OLAZABAL VALENZUELA exchanged phone numbers during this meeting. OLAZABAL VALENZUELA provided his phone number as (415) 504-4023.

9.      Phone number (415) 504-4023 is serviced by T-Mobile. T-Mobile identified the subscriber of the phone as Roberto Larios, 1200 Sycamore Dr, Antioch, CA 94509. Larios' account was opened on August 18, 2014.

10.      The Honolulu Police Department (HPD) laboratory tested the purchased crystal methamphetamine and determined the calculated amount of d-methamphetamine HCl was a total of 444.0 grams. The purity was 101 percent, with a note that the uncertainty for methamphetamine quantitation analysis is plus / minus five percent; therefore, the calculated weight is based upon a 100 percent purity.

11.      Between December 1 and 5, 2015, the HSI UCA communicated via text and phone conversation forty-four times with OLAZABAL VALENZUELA on (415) 504-4023 to arrange for the purchase of a pound of crystal methamphetamine through the mail for $4,200.

12.      On December 5, 2015, OLAZABAL VALENZUELA directed the HSI UCA to send the payment to Jose NIETO, 2810 Willow Ave Apt 215, Clovis, CA. In particular OLAZABAL VALENZUELA sent the following message to the HSI UCA: "When you send the mail, make sure they wont ask for my signature and use a movie dvd box to send it. And text the register number to me when you send it." Based on the composition of this message, your affiant believes that it was a "copy and paste" of instructions sent to OLAZABAL VALENZUELA to be forwarded to the HSI UCA regarding the money shipment.

13.      In December 2015, OLAZABAL VALENZUELA resided in Pleasant Hill, CA. Defendant Marco Antonio MORFIN ALVAREZ, aka "Jose Nieto" resided in Clovis, CA, which is approximately 180 miles southeast of Pleasant Hill, CA.

14.      On December 7, 2015, the agreed upon payment amount of $4,200 was sent in a parcel from Honolulu, HI, to the Clovis, CA, address as directed through the USPS.

15.  Between December 7 and 11, 2016, the HSI UCA communicated via text and phone conversation thirty seven times with OLAZABAL VALENZUELA on (415) 504-4023 regarding the shipment tracking information and confirmation of receipt.  Among these contacts, were requests from OLAZABAL VALENZUELA to resend the tracking number for the money shipment.  OLAZABAL VALENZUELA explained the requests for the number were due to unsuccessful attempts to track the money shipment on his end.

16.  On December 10, 2015, a controlled delivery of the money parcel at the 2810 Willow Ave. Apt 215 residence was attempted by HSI Fresno, CA, and the US Postal Inspection Service (USPIS), but no one was home.  A USPS delivery card was left at the residence with a phone number to call for re-delivery / pick-up.

17.  On December 11, 2015, a US Postal Inspector (USPI) reported that "Jose" called from (559) 283-6544 and arranged to pick up the package from the Clovis, CA, Post Office.

18.   Phone number (559) 283-6544 is serviced by Cricket.  Cricket identified the subscriber of the phone as Tony Martinez, 1425 N 9th St, Fresno, CA 93703.  Martinez' account was opened on May 14, 2015.

19.  On December 11, 2015, a controlled delivery of the money parcel within the Clovis, CA post office was conducted by HSI and the USPIS.  A male, later identified as Marco Antonio MORFIN ALVAREZ, presented the USPS delivery card left at the residence and a California ID card in the name of Jose NIETO-LEON to receive the package.  MORFIN ALVAREZ was observed arriving and departing in a black Honda Civic with California license plate 6XFB878.  At the time, this vehicle was registered to Anna Isabel ALVAREZ, who was associated to the Willow Ave address.  In March 2016, this vehicle was re-registered to MORFIN ALVAREZ.

5

20. On May 21, 2015, MORFIN ALVAREZ listed phone number (559) 283-6544 as his daytime and mobile phone number and 1425 N 9th, Fresno, CA 93703 as his address from July 1, 2001 to October 1, 2010, in paperwork submitted to the Department of Homeland Security.

21. Subsequent to the delivery of the money, to follow up on their initial agreement, the HSI UCA communicated via text and phone conversation over twenty-five times with OLAZABAL VALENZUELA on (415) 504-4023 regarding the shipment of crystal methamphetamine to Hawaii.

22. On December 17, 2015, OLAZABAL VALENZUELA instructed the HSI UCA to resend his address to (415) 875-0211, another phone number later confirmed to be used by OLAZABAL VALENZUELA. The HSI UCA sent the following name and address to that phone number: Kimo Lee, PO Box 29575, Honolulu, HI 96820.

23. After the UCA sent that name and address information, a review of phone toll records confirms multiple text message and phone calls between OLAZABAL VALENZUELA's (415) 875-0211 phone and MORFIN ALVAREZ' (559) 283-6544 phone on December 17 and 18, 2015.

24. On December 18, 2015, the US Postal Inspector that delivered the money to MORFIN ALVAREZ on December 11, 2015, observed him at the Clinter, CA, US Post Office. The Postal Inspector observed MORFIN ALVAREZ driving the black Honda, CA plate 6XFB878. Another US Postal Inspector observed MORFIN ALVAREZ mail a package addressed to Kimo Lee, PO Box 29575, Honolulu, HI, 96820, from Josh SALAS, 1425 N. 9th St, Fresno, CA. The parcel that was mailed by MORFIN ALVAREZ was addressed to the name and address that the UCA previously sent the day prior to OLAZABAL VALENZUELA via text

message.  OLAZABAL VALENZUELA obviously communicated that name and address to MORFIN ALVAREZ who put that name on the parcel that was eventually mailed.

25. Based on my training and experience, I know that is common for drug traffickers to hide their identity by using fraudulent or fictitious names on packages; i.e. Jose NIETO and Josh SALAS, and in their phone subscriber information, i.e. Tony MARTINEZ, in attempts to avoid detection and positive identification by law enforcement.

26. On December 18, 2015, OLAZABAL VALENZUELA sent the HSI UCA the USPS tracking number in a text message from (415) 504-4023.

27. Prior to OLZABAL VALENZUELA sending the HSI UCA the USPS tracking number, a review of phone toll records confirms  multiple text message and a phone call between OLAZABAL VALENZUELA's (415) 875-0211 phone and MORFIN ALVAREZ' (559) 283-6544 phone on December 18, 2015.  This information suggests that after the parcel was mailed by MORFIN ALVAREZ, he thereafter communicated the parcel's tracking number to OLAZABAL VALENZUELA, who was then able to communicate the tracking number to the HSI UCA.

28. On December 23, 2015, the Kimo Lee package arrived in Honolulu, HI and a Federal search warrant (Mag No. 15-1563 BMK) was obtained to open it.  Upon opening the package, a purported pound of crystal methamphetamine was located under numerous layers of wrapping.

29. The HPD laboratory tested the mailed crystal methamphetamine and determined the calculated amount of d-methamphetamine HCl was a total of 442.3 grams.  The purity was 100 percent.

30. Analysis of subpoenaed toll records indicated that between December 5, 2015, and December 24, 2015, MORFIN ALVAREZ' (559) 283-6544 phone number and OLAZABAL VALENZUELA's (415) 875-0211 alternate phone number were in contact thirty two times. The majority of this contact was between December 15 and 23, 2015, at twenty nine contacts. Between November 17, 2015 and December 5, 2015, there were four contacts, one of which did not appear to be successful. Likewise, between December 24, 2015, and January 19, 2016, there were only two contacts, one of which also did not appear to be successful. Based on my training and experience, the increase in telephonic contact during the pertinent time period is indicative of MORFIN ALVAREZ's complicity in the mailed crystal methamphetamine to Hawaii.

31. Analysis of subpoenaed toll records between November 16, 2015 and January 29, 2016 show no contact between MORFIN ALVAREZ' (559) 283-6544 phone number and OLAZABAL VALENZUELA's (415) 504-4023 phone number.

32. On January 26, 2016, the HSI UCA met with OLAZABAL VALENZUELA in Pleasant Hill, CA, and purchased one pound of crystal methamphetamine for $4,000. This meeting and purchase were set up through text messages between the HSI UCA and OLAZABAL VALENZUELA on (415) 504-4023.

33. The HPD laboratory tested the purchased crystal methamphetamine and determined the calculated amount of d-methamphetamine HCl was a total of 436.3 grams. The purity was 99 percent.

34. Between February and September 2016, the HSI UCA and OLAZABAL VALENZUELA on (415) 504-4023 kept in contact via text messages. In these text message conversations, OLAZABAL VALENZUELA referenced speaking to other person(s) regarding

prices for purchases of crystal methamphetamine.  Text messages in August and September 2016, arranged the purchase of four pounds of crystal methamphetamine for $3,600 / each.

35. On September 7, 2016, OLAZABAL VALENZUELA was arrested in a buy / bust during a two pound crystal methamphetamine deal and for a Federal Arrest Warrant issued in the District of Hawaii.  During his arrest three cellphones were seized.

36. On September 7, 2016, MORFIN ALVAREZ was arrested in Fresno, CA, pursuant to a Federal Arrest Warrant issued in the District of Hawaii.  During his arrest, a white iPhone cellphone (the "DEVICE") was seized.  Under rights advisement, MORFIN ALVAREZ provided his phone number as (559) 283-6544.

37. OLAZABAL VALENZUELA quickly proffered and consented to a search of his phones.  One phone was associated to the (415) 504-4023, and the other two phones were associated to the (415) 875-0211 phone number.  However, the forensic and physical examinations of the (415) 875-0211 phones, the only number that MORFIN ALVAREZ' (559) 283-6544 phone number was in contact with, did not retrieve and / or locate any texts messages dated prior to April 2016.

38. The DEVICE is currently in the lawful possession of the Homeland Security Investigations.  It came into the Homeland Security Investigations' possession pursuant to the arrest of MORFIN ALVAREZ.  While Homeland Security Investigations might already have had all necessary authority to examine the DEVICE at the time of arrest, due to prioritization and a backlog in the forensic examination of devices, this DEVICE was not searched.  The examination of this DEVICE has become relevant and a priority as MORFIN ALVAREZ has exercised his right to trial by jury.

39. Your affiant believes the white Apple iPhone seized by HSI on September 7, 2016, is the same phone used by MORFIN ALVAREZ to communicate with OLAZABAL VALENZUELA leading up to his September 7, 2016, arrest and based on this investigation, it was used by MORFIN ALVAREZ to facilitate his drug trafficking business.

40. The DEVICE is currently in storage at 595 Ala Moana Blvd, Honolulu, HI 96813. In my training and experience, I know that the DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICE first came into the possession of HSI.

41. The DEVICE was not previously searched based on a low priority due to the availability of other evidence, an unprotected statement given by OLAZABAL VALENZUELA implicating MORFIN ALVAREZ and indications by prior counsel for MORFIN ALVAREZ that the case would be resolved without a trial. The necessity for this search warrant has arisen because MORFIN ALVAREZ has expressed his intent to invoke his constitutional right to proceed to trial.

42. Based on my training and experience, I know that members of drug trafficking organizations frequently utilize websites, text messaging, and social media to facilitate criminal activities such as narcotics smuggling. All three can be found on an Apple iPhone. Specifically, drug traffickers can contact suppliers of the narcotics, facilitate the process through security while avoiding detection, and to communicate counter surveillance during the transportation of narcotics. Address books and contact lists often include the names, monikers, and contact information for individuals and businesses that are involved in drug trafficking. Furthermore, smartphones of individuals involved in drug trafficking may contain photographs and videos

taken by individuals involved in illegal drug distribution, including "trophy" photographs of contraband, as well as photographs of associates and business partners.

## TECHNICAL TERMS

43. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite

contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

44. Based on my training, experience, and research, I know that the DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

   f. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   g. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   h. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     i. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     j. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

48. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

49. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICE described in Attachment A to seek the items described in Attachment B.

 FURTHER AFFIANT SAYETH NAUGHT.

_____
AMY GARON
Special Agent, HSI

Sworn to before me telephonically, and
Attestation acknowledged
Pursuant to FRCP 4.1(b)(2):

July 15, 2019, at Honolulu, Hawaii.

_____
Kenneth J. Mansfield
United States Magistrate Judge

## ATTACHMENT A

The property to be searched is a white Apple iPhone, hereinafter the "DEVICE." The DEVICE is currently located at 595 Ala Moana Blvd., Honolulu, HI 96813.

This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.  All records on the DEVICE described in Attachment A that relate to violations of Title 21 USC, Section(s) 846, 841(a)(1) & (b)(1)(A), and involve Marco MORFIN ALVAREZ since December 2015, including:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d. all bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.